| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:11-cr-41 |
| v. ) | |
| ) | |
| BILLY WAYNE LOCKE ) | *Mattice / Lee* |

## REPORT AND RECOMMENDATION

Before the Court are Defendant Billy Wayne Locke's ("Defendant") *pro se* motions to suppress all evidence seized from his camper trailer [Doc. 58 & 61], including a supplement to the motions and various letters [Doc. 62, 64-66]. Defendant's suppression claims were referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 59]. After the Government filed its response [Doc. 63], an evidentiary hearing was held on the motions on August 24, 2012. After careful review and consideration, I **FIND** no constitutional violation with respect to any of the issues raised by Defendant, and I **RECOMMEND** that Defendant's motions to suppress be **DENIED**.

**I.     BACKGROUND**

At the hearing, the Government offered the testimony of law enforcement officers Bill Cherry, Lynette Ruebush, Mike Patterson, and Craig Frost.[1] The following summary reflects the collective testimony of the agents, which was throughly credible, and information gained from a

---

[1] The Assistant United States Attorney for the Government at the hearing reported that Officer Frost and Agent Patterson apparently violated the rule of exclusion invoked during the hearing at the Government's request by discussing witness testimony during a break. Their violation of the rule does not impact their credible testimony. They were, however, admonished against such behavior and the topic of their brief discussion, radio traffic suggesting that Defendant might be armed on the night of his arrest, has not been considered in conjunction with this report and recommendation.

review of the exhibits introduced during the hearing. Defendant did not testify and did not present any witnesses, but he did introduce exhibits, which have been fully considered.

On February 15, 2011, an Etowah, Tennessee, Police Department officer observed Defendant driving and attempted a traffic stop because he knew Defendant did not have a valid driver's license. Defendant fled when the officer attempted a stop, committing several traffic infractions in the process. The officer was forced to end his high speed pursuit, but he obtained warrants for Defendant's arrest on various charges including evading arrest, reckless driving, and driving on a revoked or suspended driver's license.

On February 16, 2011, at about 4:00 p.m., Defendant was observed driving recklessly by a McMinn County, Tennessee, Sheriff's deputy. When an attempted stop was initiated, Defendant again fled. About two hours later, around 6:25 p.m., a Madisonville, Tennessee, Officer saw Defendant at a convenience store and attempted to arrest Defendant. The deputy was injured when he was struck by Defendant's car when Defendant again evaded arrest. Following this incident, arrest warrants were issued for Defendant on February 16, 2011 on charges of aggravated assault, habitual offender, evading arrest, reckless endangerment, resisting arrest, duty to render aid, leaving the scene of an accident, and failure to report.

The Government introduced several Affidavits of Complaint from Monroe County dated February 16, 2011 and several arrest warrants from McMinn County dated February 17, 2011 [Government's Collective Exhibit 1]. Oddly enough, the Government did not provide the back of the complaints in its Exhibit 1, which is where the executed arrest warrants for Monroe County are found. However, Defendant's certified copy of the complaints contains the back with the validly executed arrest warrants dated February 16, 2011 [Defendant's Collective Exhibit 1]. In other

2

words, there were multiple outstanding arrest warrants for Defendant as of February 16, 2011.

The Tenth Judicial District Drug and Violent Crime Task Force, which includes McMinn and Monroe counties, was asked to assist with the apprehension of Defendant.[2] Several members of the task force, including Agent Bill Cherry, were familiar with Defendant due to Defendant's criminal history and felony convictions. Furthermore, agents knew Defendant lived in a small, camper trailer on his father's property.[3] Around midnight on February 16, 2011, a multitude of officers with several different agencies went to Defendant's home to find and arrest Defendant on the multiple outstanding warrants.

After the officers surrounded Defendant's trailer, Agent Mike Patterson heard human coughing from, and saw movement in, the trailer. Agent Cherry knocked on the door and announced the presence of law enforcement. Despite repeated requests, Defendant did not respond. Officers then entered the unlocked trailer to arrest Defendant on the outstanding warrants.

Four officers and a police canine entered the cramped space of the camper. Defendant refused several orders from law enforcement and attempted to hide under the covers on his bed in

---

[2] Defendant filed at least one editorial from a local newspaper concerning allegations of misconduct by the Task Force [Doc. 66]. At the hearing, the Government, apparently in response to the filing by Defendant, solicited testimony that none of Task Force witnesses were named in any of the editorial/articles featured in the newspaper and no allegations of misconduct had been made against the witnesses. Defendant may have been attempting to attack the credibility of the Task Force agents involved in his arrest by filing the editorial; however, Defendant did not offer any testimony or argument at the hearing about the allegations of misconduct, and newspaper editorial/articles are not proof of any wrongdoing by the Task Force in general or wrongdoing by the Task Force agents involved in Defendant's arrest in particular. As such, the Court will not further address allegations from the editorial/articles.

[3] Photographs of the small camper and its cluttered interior were made exhibits. Other photographs show the evidence seized as a result of the plain-view observation and the evidence discovered during a later execution of a search warrant.

the back of the trailer. After three tasers were deployed on Defendant, the officers were able to arrest Defendant and remove him from the trailer. The arrest took place after midnight, during the early morning hours of February 17, 2011. During the arrest and retrieval of the previously deployed taser darts, Agent Cherry observed shotgun shells and a speed loader in the camper in plain view. When Agent Cherry collected the shotgun shells, he saw two additional bullets in plain view, which he also collected.

Defendant was booked into the McMinn County jail as reflected in the records maintained by Officer Ruebush. The Register of Prisoners for the McMinn County Jail states on February 17, 2011, officers booked Defendant on Monroe County charges of aggravated assault, habitual offender, evading arrest, reckless endangerment, resisting arrest, duty to render aid, leaving the scene of an accident, and failure to report; a Monroe County charge of driving on a revoked or suspended license; and a host of McMinn County charges.

Officer Craig Frost, a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, was informed of the evidence collected in plain view by Agent Cherry. Agent Cherry and Officer Frost both testified the shotgun shells in plain view were immediately recognized as ammunition. They both knew Defendant, as a known convicted felon, was prohibited from possessing such ammunition.

Officer Frost traveled to the jail and asked Defendant for consent to search the camper. Although Defendant initially signed a consent form for a search of his camper, he revoked his consent before a consensual search took place. Once a consensual search was no longer an option, Officer Frost drafted a detailed application and affidavit to obtain a search warrant for Defendant's

4

camper.[4]  Upon executing the issued search warrant on February 18, 2011, Officer Frost found a fully loaded Derringer revolver, additional shotgun shells, a barrel for a shotgun, mail addressed to Defendant, and some limited drug paraphernalia.  Officer Frost found the Derringer under Defendant's mattress.

On February 21, 2011, Officer Frost interviewed Defendant following a written waiver of his Miranda rights.  Defendant denied ownership of the Derringer but admitted to hiding the gun under the mattress.

On May 24, 2011, a federal grand jury charged Defendant with possession of a firearm following a felony conviction [Doc. 1].  Defendant elected to proceed *pro se* [Doc. 53] after his appointed attorneys refused to file his motions to suppress.  However, Defendant was provided with elbow counsel and did confer with his elbow counsel during the evidentiary hearing.

## II. ANALYSIS

Defendant's arguments in support of suppression, which appear to be based on his misunderstanding or misapplication of the law, can be grouped into three claims.  First, he questions the validity of the arrest warrants claiming that they were not served on him or were not issued until after his arrest.  As a result, and because he claims the officers did not know he was in the camper, he argues the officers were not legally inside his camper at the time of their plain view observation of contraband.  He also appears to contend the shotgun shells were lawfully in his possession or not really in plain view.  Second, he argues the issuance and execution of the search warrant was overbroad and "pretextual" relying on language from the dissent in *Horton v. California*, 496 U.S.

---

[4] Government's Collective Exhibit 16 includes the application and affidavit, search warrant, and return.

128 (1990). Finally, Defendant argues there was no lawful basis for the attempted traffic stops.

Contrary to Defendant's ill-defined and unsupportable arguments, I **FIND** the officers' entry into Defendant's home was based on outstanding arrest warrants and probable cause to believe he was in the camper, his arrest and the resulting plain view observation of shotgun shells and other contraband was lawful, and the subsequent search warrant was properly issued and executed. Assuming for the sake of argument only that Defendant did not abandon his contention that the attempted traffic stops were unlawful by claiming there is no proof he was in the vehicle, and even setting aside for the moment that he never stopped, his contentions about the attempted traffic stops do not pass muster.

### A. Plain View Doctrine

It is settled that if a law enforcement officer (1) is lawfully located in a place where an object may be plainly seen, (2) the incriminating character of that object is "immediately apparent," and (3) the officer has a lawful right of access to the object, he may seize it. *See, e.g., Horton*, 496 U.S. at 136, 142 (1990). In other words, where the initial intrusion that brings the police within plain view of evidence of criminal conduct is legitimate, the Fourth Amendment will not protect a defendant from what the police can see. *Kyllo v. United States*, 533 U.S. 27, 32 (2001) ("visual observation is no 'search' at all"); *Arizona v. Hicks*, 480 U.S. 321, 328 (1987) (same).

Defendant's main argument appears to be that the officers were not lawfully located in his camper. Defendant supports this argument with two contentions: first, that the arrest warrants were not issued until after his arrest and were not served on him; and second, there was no reason to believe he was in his camper. These ill-fated contentions will be addressed in reverse order.

"[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority

to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980); *United States v. Hardin*, 539 F.3d 404, 410 (6th Cir. 2008). In the Sixth Circuit, it is unclear whether officers must have probable cause, or merely reasonable suspicion, in order to enter a dwelling to arrest a suspect. Compare *United States v. Pruitt*, 458 F.3d 477, 482 (6th Cir. 2006) (an officer must have "a lesser reasonable belief standard, and not probable cause . . . to enter a residence to enforce an arrest warrant") with *United States v. Jones*, 641 F.2d 425, 428 (6th Cir. 1981) ("an arrest warrant can authorize entry into a dwelling only where the officials executing the warrant have reasonable or probable cause to believe the person named in the warrant is within"), with *Hardin*, 539 F.3d at 416 n. 6 (noting in dicta that "the Supreme Court in *Payton* did not intend to create, without explanation or elaboration, an entirely new standard of 'reason to believe.'").

Defining the standard is not necessary, however, as I **FIND** the officers met the higher standard of probable cause to believe Defendant was in the camper. The officers knew where Defendant lived, they heard a cough from the camper, and they saw movement from within the camper. They also knew Defendant had a history of violently evading the police. Under any of the standards addressed above, the police were plainly authorized to enter the camper to arrest Defendant pursuant to warrants for his arrest.

Second, Defendant claims there is no proof the arrest warrants were issued prior to his arrest or served on him. Defendant presented no testimony, not even his own, to support such claims. In contrast, the proof is overwhelming that there were valid and lawful warrants issued for the arrest of Defendant at the time his camper was entered as well as evidence indicating the arrest warrants would have been served on him at booking. In addition, there is no requirement that the officers

7

have the physical arrest warrant on hand prior to making the arrest. *See United States v. Buckner*, 717 F.2d 297, 301 (6th Cir. 1983) ("The fact that the officers did not have the arrest warrant in hand is of no consequence."); *see also United States v. Leftwich*, 461 F.2d 586, 592 (3d Cir. 1972) ("While it is true that the arresting agents did not have the warrant with them at the time of arrest, they were not required to have it in their possession if it was outstanding at that time."). If the officers need not have the physical arrest warrants in hand to make an arrest, it follows logically that there is no requirement an arrestee be served with the physical warrants at the time of the arrest. As noted above, there is substantial proof that valid warrants were issued for Defendant's arrest before the officers came to his camper. As such, Defendant's argument that the arrest warrants are somehow invalid because they were not served upon him at the time of his arrest is without merit.

Once validly inside Defendant's camper, the plain view doctrine applied. *See United States v. Atchley*, 474 F.3d 840, 850 (6th Cir. 2006). Clear and credible evidence shows the shotgun shells and speed loader were observed by Agent Cherry in plain view. There is no credible evidence to support Defendant's claims that the officers actually searched his home during his arrest. There is also abundant credible proof the officers were aware Defendant was a convicted felon and, as such, Defendant was not permitted to possess a firearm or ammunition, making the incriminating nature of the shotgun shells and speed loader immediately apparent. *See, e.g., United States v. Lyons*, No. 10-3615, 2012 WL 2044411, at *2 (6th Cir. June 7, 2012).

Ignoring the speed loader, Defendant claims his possession of shotgun shells was not incriminating by inaccurately quoting the definition of "ammunition" under 18 U.S.C. § 921(a)(17)(A) and citing *United States v. Thomas*, 111 F.3d 426 (6th Cir. 1997). Defendant's claims are based on his misunderstanding that a shotgun shell does not meet the definition of

8

"ammunition." Suffice it to say, ammunition is correctly defined as "ammunition or cartridge cases, primers, bullets, or propellant powder designed for use in any firearm." 18 U.S.C. § 921(a)(17)(A). As indicated in the undisputed testimony, a shotgun shell meets this definition.

Defendant's reliance on *Thomas* is also misplaced as the case involved a defendant whose offense level (and sentence) were affected by a finding that exploding shotgun shells found in his home were "destructive devices" as defined in 26 U.S.C. § 5845(f). The destructive devices in *Thomas* were not simple shotgun shells but a destructive device comprised of "two parts–the explosive device at issue, and the 12-gauge shotgun shell or cartridge within which it was contained." *Thomas*, 111 F.3d at 427 n. 1. Under the reasoning of *Thomas*, a modified shotgun shell might also be considered a "destructive device," but that does not mean the incriminating character of the shotgun shells observed in plain view was not immediately apparent. Although the defendant in *Thomas* did plead guilty to a violation of 18 U.S.C. § 922(g)(1), the same charge at issue in this case, the *Thomas* opinion addresses the narrow issue of an offense level enhancement for possessing a "destructive device" as opposed to simple ammunition. *Id.* at 427-28. Therefore, the *Thomas* court's analysis lends no support to Defendant's argument.

### B. Search Warrant

In deciding whether the warrant application contained sufficient facts to support a reasonable belief in probable cause, a court considers the facts set forth in the affidavit and any facts presented during the search warrant proceeding to the issuing magistrate. *United States v. Frazier*, 423 F.3d 526, 535-36 (6th Cir. 2005). As there is no suggestion that any facts outside of the affidavit were presented in this case, the Court must make a determination of probable cause by evaluating the information contained within the four corners of the affidavit supporting the warrant. *See, e.g.*,

9

*United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) ("The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."); *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) (In reviewing the sufficiency of the evidence supporting probable cause, the court is "limited to examining the information contained within the four corners of the affidavit" in light of "the totality of the circumstances.").

In making such an evaluation, great deference is accorded to the issuing magistrates's determination of probable cause. *See, e.g.*, *United States v. Calloway*, 116 F.3d 1129, 1132 (6th Cir. 1997) (determination of probable cause should not be reversed absent clear error). "[T]he task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton,* 466 U.S. 727, 728 (1984). An affidavit supporting the issuance of a search warrant should be reviewed in a commonsense, rather than hypertechnical, manner to determine probable cause. *See, e.g., United States v. Johnson*, 351 F.3d 254, 258 (6th Cir. 2003) (citing *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001)). Probable cause to conduct a search exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

It is unclear whether Defendant is contesting the existence of probable cause for issuance of the search warrant, but to the extent he is, I **FIND** ample probable cause is set forth in the affidavit for issuance of the search warrant. To the extent Defendant claims the search warrant is overbroad as issued, a "general order to explore and rummage through a person's belongings is not permitted." *United States v. Ford*, 184 F.3d 566, 575 (6th Cir. 1999) (citations and internal quotations omitted). When a search warrant is overbroad, the remedy is severance from the warrant of the things to be

10

seized which are not supported by probable cause. *Ford*, 184 F.3d at 578. Defendant has not shown the warrant is in any way overbroad or that any of the items were seized without probable cause.

Defendant also appears to claim the execution of the warrant was overbroad because the search was "pretextual," relying upon the dissent in *Horton* as previously noted. This argument is completely meritless. Even if the language from the dissent is considered, the dissent was speaking about pretextual searches being prohibited–such as when an officer enters a house pursuant to a warrant for one crime when he is really only interested in seizing evidence related to another crime for which he does not have a warrant. *Horton*, 496 U.S. at 147. There is no proof to suggest anything about the officer's search pursuant to the properly issued warrant in this case was pretextual in any way.

There is simply no evidence to support Defendant's claims that the execution of the search warrant was in any way improper. "The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991) (citation and internal quotations omitted). The warrant in this case easily complies with this standard as it clearly describes the firearms, ammunition and related items to be seized with particularity.

### C. Attempted Traffic Stops

Defendant's filings indicate he also questions the legality of the attempted traffic stops. In support of this misguided argument, Defendant cites state and federal cases consistent with the holding in *Delaware v. Prouse*, 440 U.S. 648 (1979). Defendant claims such cases stand for the proposition that stopping an automobile in order to check a driver's license and registration is always unreasonable under the Fourth Amendment. Defendant fails to understand or mention that

11

such stops are not unreasonable if officers have an articulable and reasonable suspicion that a motorist is unlicensed, as was the case here. *See e.g., Prouse*, 440 U.S. at 663. In any event, the Fourth Amendment governs actual seizure, not attempted seizures, so the Government need not justify the *attempt*s to stop Defendant. *See United States v. Smith*, 456 F. App'x 572 (6th Cir. 2012) (holding that police need not justify their attempt to stop a defendant who evades their attempt).

### III. CONCLUSION

For the reasons stated above, I **RECOMMEND** that Defendant's motions to suppress [Doc. 58 & 61] be **DENIED**.

### NOTICE TO DEFENDANT

Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. **Failure to file objections within the time specified waives the right to appeal the district court's order.** *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are "frivolous, conclusive or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation marks and citation omitted). **Only specific objections are reserved for appellate review.** *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE